**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ATHANOR, LLC, ARGENTHAL GLOBAL HOLDINGS LTD (MALTA), ARGENTHAL SANSOVINO SAS (FRANCE), and FRANÇOIS GARCIN, <br><br> Plaintiffs, <br><br> v. <br><br> MARA HOLDINGS, INC. and JOHN DOES 1–10, <br> Defendants. | Case No. 26-cv- <br><br> **COMPLAINT** <br><br> Jury Trial Demanded |

Plaintiffs Athanor, LLC, Argenthal Global Holdings Ltd (Malta), Argenthal Sansovino SAS (France) (collectively, the "Advisor Entities"), and François Garcin ("Garcin") (collectively with the Advisor Entities, "Plaintiffs"), bring this action against Defendants MARA Holdings, Inc. ("MARA" or the "Company") and Defendants John Doe #1 through John Doe #10 (collectively, the "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs entered into an engagement agreement (the "Engagement") with MARA pursuant to which Plaintiffs led MARA's transatlantic expansion and politically sensitive acquisition of a majority stake in a French AI/high-performance-computing company, Exaion SAS ("Exaion"). At the time, Exaion was considered one of France's digital-infrastructure crown jewels and was an affiliate of EDF, the State-owned, electric-utility multinational. The Engagement is attached hereto as **Exhibit A**.[1]

---

[1] The Engagement identifies its parties as: (i) Garcin, as principal shareholder and managing member of the Advisor Entities, (ii) MARA, and (iii) the Advisor Entities and certain affiliated entities (defined together as the "Advisors"). Garcin executed the Engagement on behalf of the

2.      Although the Engagement should have marked the beginning of MARA's transition towards becoming an international leader in artificial intelligence, high-performance computing ("HPC"), digital energy, and Bitcoin mining, several key MARA Executives feared it would mark the end of their power and influence at the Company, so they began conspiring to interfere with the Engagement with the hope that it would thwart Plaintiffs' ability to perform their contractual obligations to MARA and thereby sustain the executives' power and influence within the Company.[2] When that did not work and the Exaion deal closed, with several more deals like it on the horizon, the MARA Executives got desperate and caused MARA to terminate the Engagement and simply walk away without paying the bill.

3.      MARA is a NASDAQ-listed, digital-energy, and Bitcoin-mining company based in the United States. The Company recently took steps towards increasing its international footprint, but the MARA Executives maintained an America-first culture, where executives frequently used expressions like "Make MARA Great Again!," and sought to keep power, influence, and resources centered in the United States.

---

Advisor Entities as their authorized signatory. The remaining entities named as "Advisors" in the Engagement are: Argenthal Capital (Canada), Argenthal Srl (Italy), Argenthal (Cyprus), Argenthal Ltd (Hong Kong SAR), Argenthal Financial Group LLC (Wyoming), Arlington Capital Limited (United Kingdom), and Argenthal Holdings, LLC, Smith Goffman SAS (France), SGP Capital Advisors, LLC, and SGP Securities, LLC. These entities did not provide services under the Engagement and are not plaintiffs in this action.

[2] These MARA Executives included Salman H. Khan ("Khan") (Chief Financial Officer of MARA, *Directeur Général* of MARA France), Zabidullah Nowaid ("Nowaid") (General Counsel and Corporate Secretary of MARA, *Directeur Général* of MARA France), Duncan Dickerson (member of MARA's corporate-development function with responsibility for the Exaion transaction) ("Dickerson," with Khan and Nowaid, the "Triumvirate") and Frederick G. Thiel (Chief Executive Officer and Chairman of MARA and *Président* of MARA France) ("Thiel," together with the Triumvirate, "the MARA Executives").

4.    In or about late 2024 and early 2025, MARA became interested in pivoting into artificial-intelligence and high-performance-computing infrastructure and installing itself in the institutional and energy/technology landscape in France. MARA knew that as an American company this would be difficult to accomplish and that it would have to navigate the politically sensitive, foreign-investment authorization process in France. To help build up its European business and, in particular, spearhead its expansion into France, Thiel turned to François Garcin, a French citizen and founder/principal of the Advisor Entities.

5.    Thiel led Garcin to believe that MARA's interest in France was part of a strategic realignment towards becoming a transatlantic company. In other words, despite being headquartered in the United States, MARA was prepared to make a significant investment in a French subsidiary and establish meaningful operations on the other side of the Atlantic. Thiel and Garcin both knew that this transatlantic approach would be essential to convincing French stakeholders that MARA's involvement in France was not opportunistic but part of a lasting strategy.

6.    Based on Thiel's representations to Garcin about MARA being pro-France, Garcin encouraged Thiel to pursue, among other transactions, the acquisition of Exaion, a strategic technology subsidiary of French-State-owned electricity champion EDF. Thiel agreed and retained Plaintiffs to provide advisory services to MARA and make the case to France's government and to France's leading energy players that MARA's acquisition of Exaion was not a threat to French sovereignty and would serve France's national interest and position France at the center of a new transatlantic energy and artificial-intelligence infrastructure. In short, to show that MARA's acquisition of Exaion was not simply to get France to turn over a financial, strategic, and geopolitical lever to an American company.

7.      Plaintiffs fulfilled all their contractual obligations to MARA and delivered on every level. They originated and advanced MARA's relationships with France's most important energy companies (like EDF, TotalEnergies ("Total"), Engie, and RTE), assembled MARA's European team to work on these issues, helped establish the MARA France and MARA Europe operating entities needed to make the deal go through, and navigated the politically sensitive foreign-investment-approval process at the highest levels of the French State.

8.      Plaintiffs did everything they were required to do.  MARA publicly credited Garcin with having "spearhead[ed]" the formation of MARA France and MARA Europe and with having played an "instrumental role" in securing a majority ownership interest in Exaion. MARA even publicly hailed the Exaion transaction as the cornerstone of its transition from Bitcoin mining into artificial-intelligence and HPC infrastructure—the very business that MARA had engaged Plaintiffs to help build.

9.      Unbeknownst to Garcin, however, Thiel's statements about MARA wanting to make a strategic pivot towards becoming a transatlantic company and establishing meaningful operations on the other side of the Atlantic were inaccurate and misleading. Whereas MARA publicly embraced the pro-France, pro-European, sovereign-energy strategy that Thiel supposedly retained Garcin to implement, a cohort of senior MARA executives, including the Triumvirate, deliberately and resisted these efforts and sought to sabotage this transatlantic strategy. They did this for their personal benefit, even though it meant going against the interests of MARA and its shareholders, because they knew that the rise of MARA France and MARA Europe—and of Garcin as the face of that European enterprise—threatened to shift power, influence, and resources away from the U.S.-based executives who had built their careers and compensation around MARA's domestic operations. This led the MARA Executives to conspire to interfere with the

Engagement, including ultimately causing MARA to refuse to pay Plaintiffs for the services provided.

10.    The Triumvirate worked together to block payment to Plaintiffs by, among other things, accusing Garcin of artificially inflating its invoice related to the Exaion acquisition. They claimed that the French value-added tax ("VAT") included in the invoice was a sham and that Plaintiffs owed no such tax. All these attacks were completely unfounded. The Triumvirate, and eventually Thiel, were simply using the VAT issue and other pretextual attacks to accomplish what they had been working toward all along: to hinder the meteoric success that Plaintiffs had achieved pursuing the transatlantic strategy, because that success, which was in the interest of MARA and its shareholders, threatened to shift power and influence within MARA toward Garcin and the European entities and away from the American executives. The pretextual nature of the VAT issue is undeniable.  MARA had never raised any objection to the VAT when paying Plaintiffs' earlier invoices and completely disregarded the legal opinion Garcin provided to explain why he believed VAT was owed under French law. Moreover, MARA had no objection to paying the VAT to its other European advisors, like their investment bankers Stifel Institutional Group ("Stifel"), even for that same Exaion transaction.

11.    When Garcin insisted on Plaintiffs getting paid their fees and VAT, MARA summarily terminated the Engagement on March 6, 2026, and refused to pay Plaintiffs for the services they had provided. MARA waited to terminate the Engagement until after the Exaion transaction had closed, and after Garcin had gathered the support of French stakeholders for MARA's purported transatlantic strategy. Plaintiffs had to retain legal counsel to help them seek payment and enforce the Engagement, so they sent MARA a formal written request asking for advancement and indemnification, which MARA is contractually required to provide under the

Engagement. MARA once again refused to pay. Instead, after getting rid of Plaintiffs, MARA pivoted back toward its original America-centered strategy and undertook a purge of its French leadership and consultants, including Amarante, Gérard Mestrallet, and Forward Global's Steven Zunz.

12.    As a result of this conduct, MARA intentionally breached the Engagement and the implied covenant of good faith and fair dealing contained therein.

13.    By this action, Plaintiffs seek compensatory damages of no less than approximately €6.92 million currently due and owing under the Engagement, plus declaratory relief for approximately €4.4 million contingent upon a further funding tranche (which, upon information and belief, will occur during the pendency of this action), totaling no less than approximately €11.32 million, exclusive of interest and VAT; contractual advancement and indemnification of Plaintiffs' fees and costs, currently exceeding $600,000 and continuing; and such further relief as the Court deems just and proper.[3] In the alternative to contractual damages, Plaintiffs seek the reasonable value of their services pursuant to a quantum meruit / unjust enrichment theory.

## THE PARTIES

### A.    Plaintiffs

14. Plaintiff François Garcin is an individual, who is a citizen of France and is domiciled in Italy. Garcin, since 2006, is the principal shareholder and managing member of the Advisor Entities and other companies throughout the world.

15.    Plaintiff Athanor, LLC ("Athanor") is a limited liability company organized under the laws of the State of Florida. Athanor is one of the "Advisors" retained under the Engagement,

---

[3] Per the exchange rate as of the date of this Complaint, excluding the €4.4 million and interest but including VAT, the total amount MARA owes Plaintiffs pursuant to the Engagement exceeds $10 million. With the €4.4 million, this amount will exceed $16 million.

provided services, and issued invoices for the advisory and success fees at issue. For purposes of diversity, the citizenship of Athanor is that of its members; its sole member is François Garcin, a citizen of France currently residing in Italy. Athanor is therefore a citizen of France and/or Italy.

16.     Argenthal Global Holdings Ltd (Malta) is an entity incorporated under the laws of Malta, is one of the "Advisors" retained under, and a signatory to, the Engagement, and provided services under the Engagement. For purposes of diversity, Argenthal Global Holdings Ltd (Malta) is a citizen of Malta.

17.     Plaintiff Argenthal Sansovino SAS (France) is an entity incorporated under the laws of France, is one of the "Advisors" retained under, and a signatory to, the Engagement, provided services, and issued invoices for the advisory and success fees at issue. For purposes of diversity, Argenthal Sansovino SAS is a citizen of France.

### B.      Defendants

18.     Defendant MARA is a corporation incorporated under the laws of the State of Nevada with its principal place of business at 101 NE 3rd Avenue, Suite 1200, Fort Lauderdale, Florida 33301. MARA's common stock trades on the Nasdaq Global Select Market under the symbol "MARA." For diversity jurisdiction purposes, MARA is a citizen of Nevada and Florida. MARA is the "Company" that retained the Advisors under the Engagement.

19.     At all relevant times, the John Doe Defendants were individuals whose names and identities are presently unknown to Plaintiffs, despite due diligence. Upon information and belief, each of the John Doe Defendants was employed by, affiliated with, acting on behalf of, or in concert with the MARA Executives. Plaintiffs will amend this Complaint to substitute the true names and identities of the John Doe Defendants when they become known through discovery or further investigation.

C.  **Relevant Individuals**

20.    Fred Thiel is an individual and, at all relevant times, served as the Chairman and Chief Executive Officer of MARA. On information and belief, Thiel is a citizen of the State of Florida. Thiel executed the Engagement on behalf of MARA and served as the President (*Président*) of MARA's French operating entities. Upon information and belief, prior to meeting Garcin, Thiel had little to no European business experience; nor did he have any high-level business or government contacts in France.

21.    Salman H. Khan is an individual and, at all relevant times, served as the Chief Financial Officer of MARA. On information and belief, Khan is a citizen of the State of California. Khan was also appointed a *Directeur Général* (General Manager) of MARA's French subsidiary. Upon information and belief, prior to meeting Garcin, Khan had little to no European business experience; nor did he have any high-level business or government contacts in France.

22.    Zabi Nowaid is an individual and, at all relevant times, served as the General Counsel and Corporate Secretary of MARA. On information and belief, Nowaid is a citizen of the State of California. Nowaid executed MARA's March 6, 2026, termination letter to Plaintiffs and was also appointed a *Directeur Général* of MARA's French subsidiary. Upon information and belief, prior to meeting Garcin, Nowaid had little to no European business experience; nor did he have any high-level business or government contacts in France.

23.    Duncan Dickerson is an individual and, at all relevant times, was a member of MARA's corporate-development function with responsibility for the Exaion transaction. On information and belief, Dickerson is a citizen of California. Upon information and belief, prior to meeting Garcin, Dickerson had little to no European business experience; nor did he have any high-level business or government contacts in France.

**JURISDICTION AND VENUE**

24.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1332(a)(2) because: (1) this is a civil action between: (a) citizens or subjects of foreign states and (b) citizens of States of the United States; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

25.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over any claim that does not independently satisfy § 1332, because all claims form part of the same case or controversy.

26.     This Court has personal jurisdiction over MARA, and venue is proper in this District, because the Engagement contains a forum-selection clause in which the parties: (1) agreed that any dispute "arising out of the Advisors' engagement [] shall be brought and maintained exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York[,]" and (2) irrevocably submitted to the jurisdiction of those courts. The Engagement is also governed by New York law.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b) and pursuant to the parties' contractual forum-selection clause designating this District.

**FACTUAL ALLEGATIONS**

A.     **MARA Hires Garcin to Establish MARA France and Europe**

28.     Beginning in mid-2024, MARA systematically retained Garcin and his affiliated entities to build MARA's European business, entering into a series of consulting and advisory agreements that expanded in scope as Garcin delivered results. By June 22, 2025, MARA had seen Garcin deliver excellent results, so Thiel signed the Engagement on behalf of MARA, making Plaintiffs MARA's exclusive advisor on several potential international transactions, including the

Exaion transaction (or "Project Nebula"). The allegations that follow establish the contractual foundation of the Engagement, the transatlantic growth that the Engagement incentivized, and the full scope of the services MARA retained Plaintiffs to provide under the Engagement.

29.     On June 27, 2024, MARA (then Marathon Digital Holdings, Inc.) first retained Garcin, through Athanor, to serve as its strategic advisor regarding the attempted acquisition of a publicly traded company. Under that agreement, MARA agreed to pay Athanor a fee of no less than $15 million upon the closing of any acquisition of that publicly traded company or any successor entity, plus a cumulative expense allowance. The agreement was signed by Nowaid on behalf of MARA.

30.     Although this strategic M&A project did not ultimately close,[4] Garcin facilitated strategic dialogue with the key stakeholders of the target company. This early engagement showcased Garcin's advisory skills and the potential for Garcin's entities to successfully implement MARA's European strategy.

31.     On November 26, 2024, Garcin proposed to Thiel a framework for their business relationship, outlining "three modes" for them to cooperate: (1) transaction-related workstreams (M&A, capital markets, financing, and fund management regulated work); (2) Business development/consultancy (business development, energy, utilities, and interfacing with decision-makers across Europe); and (3) employment/in-house. Garcin demonstrated his loyalty and long-term commitment towards MARA by making it clear that his "main objective is building equity in MARA, through warrants/stock options package."

---

[4] On information and belief, this project did not close successfully because of the Triumvirate and, in hindsight, was the first whiff of their lack of financial and strategic sophistication. Since, the target company's value has sharply increased, and this mistake, alone, cost MARA and its shareholders billions of dollars.

32.     By the June 22, 2025, Engagement, MARA retained the Plaintiffs to provide advisory services to MARA "in connection with various corporate finance[,] investment and/or acquisition opportunities" and "potential [s]trategic [j]oint [v]enture[s]" with "[e]nergy [m]ajors and [e]lectric [u]tilities," including the acquisition of Exaion and the development of data centers for Bitcoin mining and HPC.[5]

33.     The Engagement defines the "Company" as "MARA Holdings, Inc. (together with its affiliates and subsidiaries[])," expressly extending its scope to any MARA entities through which MARA carried out the transatlantic initiative.

34.     Section 2 of the Engagement sets out the fees MARA agreed to pay, including, in relevant part:[6]

- **Exaion Success Fee.** If MARA made a cash investment in Exaion to acquire Exaion's capital stock within twelve months of the Engagement, MARA agreed to pay "a fee equal to 4% of such cash investment in Exaion[.]" (Engagement § 2(ii)(a).)

- **Monthly Advisory Fee.** MARA agreed to pay an advisory flat fee of €2.4 million, "distributed over 12 equal monthly installments of €200,000 from July 1st[,] 2025[,] through July 1st[,] 2026[.]" (Engagement § 2(iii)(a).)

35.     MARA's financial resources vastly outweigh Plaintiffs', so the Engagement contained an indemnification and advancement agreement, attached to the Engagement as

---

[5] The Engagement also mentions investment-banking services, but providing such services was not a condition for performance. In any event, MARA requested that Garcin and his entities refrain from providing any such services, and Garcin provided support to MARA's internal investment bankers.

[6] The Engagement provides for additional compensation formulas, which are not directly relevant to the claims in this Complaint, including a Power Fee and a Novakamp Fee, but with respect to which Plaintiffs reserve all rights.

Attachment A, which the parties agreed is "an integral part" of the Engagement. (Engagement § 6.)

36.     Under Attachment A, MARA agreed to indemnify Plaintiffs and their representatives and to reimburse them for their reasonable out-of-pocket legal fees and expenses, as incurred, "in connection with any matter in any way relating to or referred to in the Engagement or arising out of the matters contemplated by the Engagement [. . .] including, without limitation, in enforcing the Engagement[.]"

37.     On June 25, 2025, MARA issued a press release announcing European leadership appointments and the establishment of Paris as its European headquarters. The press release stated that Garcin had "been responsible for spearheading the formation of MARA France and MARA Europe" and, although the deal had not closed yet, MARA was already crediting Garcin with playing "an instrumental role in securing the Company's recent investment agreement with Exaion." MARA also announced the appointment of Gérard Mestrallet, the former Chairman and CEO of Engie, as Senior Advisor, describing him as "a respected business leader in Europe, with a career spanning decades in the global energy and infrastructure sectors[.]" These appointments were part of MARA's public facing "international growth strategy."

38.     On July 3, 2025, MARA entered into a separate consulting agreement ("Consulting Agreement") with Garcin personally, under which Garcin was to "originate joint ventures and other energy projects between the Company and energy companies, both in the United States and internationally," "originate mergers and acquisition transactions for the Company," and "assist the Company with its customer acquisition and other sales initiatives[.]" The agreement provided for a cash retainer of $350,000, annually, a cash bonus of "[u]p to $175,000 annually[,]" and equity compensation of up to 1,132,502 shares of MARA's stock (represented to be worth $20 million),

with shares earned at a rate of "169 shares of the Company's [s]tock for each megawatt of capacity" delivered to MARA pursuant to energy projects."[7]

**B.      MARA Leads Garcin to Believe It Has a Transatlantic, Pro-France Vision**

39.      Thiel led Garcin to believe that MARA was retaining him and the Advisor Entities to pivot towards a transatlantic, pro-France, pro-European strategy and personally endorsed the vision of a France-centered partnership between MARA and France's leading energy companies. Thiel directed Garcin to "close the door" with "a very loud bang" on others seeking to partner with France and to convince President Macron and other French stakeholders that an American company like MARA's entry into France was not a Trojan horse but represented a strategic advantage. This was the strategy for which Plaintiffs were retained and on which they delivered.

40.      On March 1, 2025, Garcin communicated to Gérard Mestrallet the strategic vision he was developing for MARA in France, stating: "We plan to create a group with Mara's [i]ntegrated [t]echnology, and the energy expertise of EDF, Total, Engie and others." Garcin explained that "[t]he objective is to create a large group at the intersection of Energy and Computation" and that his "idea would be to list this company in Paris to create a core shareholder base." Garcin invited Mestrallet to join MARA France and was able to recruit him as senior advisor.

41.      On March 29, 2025, Thiel endorsed this transatlantic vision, telling Garcin: "We need a structural alliance with the French energy companies and government as the partner for this initiative across French energy assets. It would be a French domiciled partnership between a US tech company and the French where possibly even the French ownership is a majority (through

---

[7] Garcin's individual claims arising under the Consulting Agreement (including but not limited to unpaid salary, bonus, and equity) are subject to arbitration and are therefore not asserted in this action. Garcin intends to file an arbitration demand imminently.

public float, government investment etc...)." Thiel added: "Essentially close the door to others with a very loud bang" and "make it clear that we want to 'help' Macron get a win here so Le Pin [*sic*] doesn't do what Trump did to Biden by embracing crypto when Biden did not. Better that they partner with the biggest most relevant miner than some Chinese owned company." Garcin agreed and said his team was "curating that exact message" and that "Gerard will say the same to Emmanuel Macron in person."

42.    On April 2, 2025, at Thiel's request, Garcin prepared talking points for Thiel's call with Gérard Mestrallet, including: "with you we are confident we can create a Major European Corporation of significant scale & value." The talking points also stated that MARA's "involvement here in France is not opportunistic but strategic" and that MARA had the "ambition to create a European champion and take it public in the arc of the next 2-3 years."

43.    On April 27, 2025, Gérard Mestrallet, wrote to a senior French government official stating that he had "begun to convince Fred Thiel, the CEO and founder of Mara, to build a major project in France" and that "Mara would therefore create a French subsidiary that would invest approximately 4 billion euros in data centers over three years and 10 billion euros over five to seven years." Mestrallet requested that Thiel and Garcin be invited to the annual "Choose France" summit,[8] stating that "[it] would be a powerful lever to complete the work of persuasion [he had] begun."

44.    On May 2, 2025, Mestrallet sent a follow-up message to the senior French government official requesting that Thiel and Garcin be invited to the annual Choose France summit at Versailles, stating that "[a]t stake [are] €4 billion in investments over 3 years and €6

---

[8] Upon information and belief, Choose France is a summit created by the French President to bring together international leaders interested in investing in innovative technologies in France.

billion more in the following 3 years." The official responded that she was "willing to make a very small exception" and invited Thiel. Mestrallet then confirmed to Garcin that Thiel would receive an invitation from the Elysée, and Garcin confirmed that Thiel had already arranged his private jet for the trip. Thiel's attendance at the Choose France summit was secured through Plaintiffs' efforts and relationships on MARA's behalf.

45.     On June 5, 2025, MARA prepared a slide deck for EDF presenting the partnership opportunity as "[u]niquely delivered by EDF and MARA," highlighting MARA's "[g]lobal industry leader in BTC," "[u]nique hardware + software suite," and being "[d]edicated to European [g]rowth." On June 9, 2025, MARA presented to Exaion a "partnership thesis" summarizing MARA's digital-energy, computing, and data platform and overlapping growth priorities with Exaion in Europe, including sovereign cloud services and HPC. These presentations reflected the transatlantic strategy that Plaintiffs had been engaged to develop and advance.

46.     On June 29, 2025, Garcin drafted key points for a diplomatic letter to EDF's leadership, stating that "EDF represents a major strategic partner for Mara both in Europe/France and other markets" and that MARA sought "a holistic partnership from Electrons to Token Economics." Garcin also coordinated the strategy for the Exaion bid, advising that the letter of intent be "signed by [Khan and Thiel] in [their] respective capacities as President [. . .] and Directeur General [. . .] of Mara France." These communications showed the depth of Plaintiffs' strategic advisory role in structuring MARA's approach to its most important French counterparties.

47.     On August 21, 2025, Garcin drafted a detailed legal and political memorandum for Gérard Mestrallet, intended for submission to French government officials, arguing that the EDF-MARA-Exaion partnership "does not constitute a simple industrial operation: it is a strategic

choice of national interest, with direct consequences on France's digital sovereignty, its leadership in the energy transition and Europe's positioning on the world stage." The memorandum analyzed the applicable French foreign-investment-control framework, argued that the transaction did not warrant regulatory blocking, and framed the partnership as creating "a European industrial champion under French governance." Mestrallet responded that the draft was "very good" and suggested additions referencing "the future Paris IPO" and the transaction's alignment with "La Startup Nation, France 2030, Choose France, AI Summit, Paris Europlace."

48.    On February 12, 2026, a presentation prepared by Forward Global for MARA stated that "MARA has chosen France as its strategic entry point into the continent" and "estimated investment of over €3 billion over 3-5 years." These presentations confirm that, as late as February 2026, MARA was claiming to be committed to the pro-France strategy Plaintiffs had been engaged to build.

C.  **MARA's Transatlantic Strategy Is Necessary to Overcome French Skeptics**

49.    The path to French regulatory approval was not smooth and required Plaintiffs' constant, expert navigation. French politicians were skeptical of MARA taking over a strategic French company and publicly attacked the Exaion transaction as a threat to French sovereignty, triggering a formal investigation by the Strategic Information and Economic Security Service and a criminal referral to the National Financial Prosecutor's Office.

50.    MARA used Garcin and his team, with their deep relationships at the Elysée, in the French government, and among France's energy majors, to credibly make the case that MARA's acquisition of Exaion was not a Trojan horse and would serve France's national interest. And Thiel understood the scale of the political opposition Plaintiffs would have to overcome on MARA's

16

behalf and the need to show MARA was embracing a transatlantic (as opposed to an America-first) strategy.

51.    On September 12, 2025, Gérard Mestrallet sent a message to an EDF executive, apologizing after that executive's name appeared in an article about the Exaion transaction. Mestrallet said, "The press seized upon the EXAION affair giving it a disproportionate dimension relative to the size of the company." Mestrallet wrote that Thiel "thought he was a good friend of France and a good student of Choose France" and was "disappointed by the criticism that gives Mara an image that does not correspond to reality."

52.    On September 27, 2025, French politician Éric Ciotti publicly warned against the Exaion transaction, stating that it constituted a loss of French sovereignty. Garcin forwarded this article to Mestrallet as part of his ongoing monitoring of the political environment surrounding the transaction.

53.    On October 8, 2025, French Member of Parliament Philippe Latombe published an article in La Tribune titled "Mara's entry into Exaion's capital: a miscalculation and a fault for our sovereignty," arguing that the sale of Exaion to MARA would subject France to "American extraterritorial laws" and that "[France's] financial sovereignty is therefore at stake." Latombe stated that he had "sent a warning letter to the Minister of the Economy who ordered an investigation by the Strategic Information and Economic Security Service (SISSE)."

54.    On December 22, 2025, newspaper La Lettre reported that French Senator Dany Wattebled and Deputy Philippe Latombe had submitted a report to the National Financial Prosecutor's Office (Parquet National Financier) "in which they denounce the conditions of the ongoing sale of Exaion," raising suspicions of "misuse of corporate assets," "organized fraud," "illegal conflict of interest," and "influence peddling" targeting MARA, Mestrallet, and others.

17

The report catalogued "the means deployed by the American company in terms of lobbying" and noted that "Mara's European Managing Director, François Garcin, and the former head of GDF Suez multiplied meetings with ministers, advisors and parliamentarians to defend Mara's offer." Despite this intense political opposition, Plaintiffs continued to advance MARA's interests with the French government and ultimately secured the regulatory approval necessary for the Exaion transaction to close.

55.     On January 19, 2026, an executive of Exaion wrote to Garcin: "It would be great if Mara would accept and sign the commitment letter asap, before Trump does something too stupid or the government potentially falls this Thursday following the 49.3."[9] The executive added: "They could be censured as early as tomorrow. If the government falls I don't know if we can move forward." Garcin reassured the executive, explaining: "It's going to be fine I think. Let's think positive." This exchange illustrated the acute political instability that Plaintiffs were required to navigate in real time to secure the French government's authorization of the Exaion transaction, and the critical role Plaintiffs played in maintaining momentum during that period.

### D.     Plaintiffs Fully Perform and Overcome French Political Opposition

56.     Even before the Engagement with MARA was hammered out, Garcin and his team organized and attended dozens of high-level meetings with France's most powerful energy executives, government officials, and financial institutions, all on MARA's behalf and with MARA's full knowledge. Garcin personally recruited Gérard Mestrallet, assembled MARA's European advisory team, established MARA's French and European entities, and navigated the

---

[9] On information and belief, Article 49.3 of the French Constitution is a constitutional power that allows the Prime Minister to force the passage of a bill without a parliamentary vote. Lawmakers can respond with a censure motion, which, if successful, causes the bill to be rejected and the government to resign.

difficult foreign-investment-approval process to a successful conclusion. The scope of the services Plaintiffs delivered to MARA cannot be disputed in good faith.

57.     On January 28, 2025, Garcin introduced Thiel to Alexander Hollander, the CEO of Amarante, "a global leader in the security & intelligence business for energy companies, and sovereign defence & infrastructure business," whose company was "responsible for the protection and security design of many agencies and key businesses throughout Europe." Garcin promised that "if we can confirm in time a briefing of the Élysee Palace by Mara on the JV opportunity with the Major French Energy Companies (EDF, Engie, Total, CNR and their respective affiliates), [he would] make sure that [Hollander would] accompany us to the Elysée Palace (French Presidency HQ)." This "would help us secure a top down prescription of the major companies to work in JV with Mara going forward."

58.     On February 7, 2025, Garcin reported to Thiel several meetings he secured in France, including a "meeting with Gérard Mestrallet" and one with the "Elysee confirmed for morning of [February] 25."

59.     On February 18, 2025, Garcin coordinated meetings with EDF, Total, Engie, Eiffel, and Exaion, all so that MARA could lay out its topics of interest including entering into joint ventures on HPC and Bitcoin production sites and show that it is ready to invest in France on a large scale but wants to be able to hold the market with partners capable of co-investing in energy or capital to build a sustainable business.

60.     On February 23, 2025, Garcin provided Thiel with a detailed schedule for an upcoming Paris trip, including meetings with executives of Engie, Amarante, EDF representatives including the "Directeur en charge de l'installation de grands sites de consummation" and the

"Group Head of M&A," and a meeting at the "Cabinet du Président de la République, Palais de l'Elysée." The schedule also included meeting an executive of Exaion.

61.    On February 27, 2025, following the Paris meetings, Thiel acknowledged the progress Garcin was making, stating: "Interesting how the whole 'machine' wants to play a part in this story in the making. We owe them an investment proposal outlining job & wealth creation with some concrete Asks."

62.    On March 8, 2025, Garcin sent a detailed email to Thiel and MARA's leadership team reporting that "the 'French Establishment System' is responding very well to [our] strategic manifestation of interest to install Mara in the institutional & energy/technology landscape in France" and outlining a plan to "form two local companies": "Mara Europe S.A (passive holding)" and an operational management company, to be chaired by Gérard Mestrallet with Thiel as Chief Executive Officer.

63.    On March 13, 2025, following a meeting with Engie that Garcin had arranged, Thiel again acknowledged Garcin's progress, saying "Nice to have the other team endorsing our strategy." Garcin separately reported to Khan that the Engie meeting "went as well as it could have" and that Engie had designated personnel "to engage with [MARA] across 5/6 different sites." These communications show that Thiel and other senior MARA executives were aware of, and credited, Plaintiffs' work in originating and advancing MARA's relationships with France's leading energy companies.

64.    On March 26 and 27, 2025, Garcin coordinated with MARA's Chief of Staff, Alison Ford ("Ford"), to arrange Thiel's next trip to Paris, confirming meetings including: "pending meetings" with "Exaion & EDF," "TotalEnergies," "BPI France (Sovereign wealth bank)," "Various Banks & investment houses," and "ministers & state o[ff]icials."

20

65. On May 13, 2025, Garcin informed Thiel of meetings arranged for his upcoming Paris visit, including a meeting with the "Novakamp CEO," a dinner with Mestrallet "to discuss a few key topics including investors, financing options, French leadership messaging," and attendance at the Choose France summit at Versailles.

66. On May 21, 2025, MARA's own internal team asked Garcin to use his Paris connections to unblock an internal delay at Engie North America. MARA's Director of Onsite Power wrote to Garcin explaining that Engie's internal power-sales unit was delaying a term sheet and that Engie's representative had "specifically asked if, during MARA's ongoing dialogue with the Paris HQ [ . . .] [MARA] could raise this crucial point about speed and highlight the current internal dynamic at [Engie] regarding the Term Sheet delay." The email stated that "Fred and Alison are aware of the situation and asked [him] to reach out to [Garcin] for any assistance [Garcin] can provide." This communication confirmed that MARA's own leadership recognized and relied upon Garcin's unique access to Engie's Paris headquarters to advance MARA's commercial interests.

67. On June 14, 2025, following the extensive series of Paris meetings that Garcin had organized, Thiel wrote to Garcin: "Great work on the conquest of Gaul. We must now consolidate and fortify our territories so no other can enter into trade with our new partners." Thiel added: "Good job!"

68. On August 6, 2025, Thiel wrote to Garcin: "EDF approved revised terms for Exaion w[ith] earn-out. Moving forward w[ith] documents to sign later this week. Congratulations looks like you're a co parent of a French tech company." This exchange occurred just days before the execution of the investment agreement between MARA and Exaion, indicating Thiel personally

21

credited Garcin with having secured EDF's approval of the revised transaction terms and regarded Garcin as a co-originator of the Exaion transaction.

69.     On November 13, 2025, Mestrallet wrote to the Director General of the French Treasury, requesting a meeting with Thiel during his upcoming Paris visit, stating: "the spotlight is on this company with €5m in revenue, when Mara is negotiating with TOTAL, ENGIE, EDF, RTE, the Occitanie and Normandy regions projects totaling more than €10 billion." Mestrallet added: "I think it is difficult for the Treasury to make a judgment on EXAION, disconnected from MARA's overall strategy which will have major impacts for our country. And I would not want the difficulties encountered on EXAION to discourage Fred Thiel from building his international strategy from a French platform, which we had convinced him to do before the recent controversies." This outreach was part of the ongoing effort by Plaintiffs and their team to secure French government support for MARA's strategy.

70.     On January 14, 2026, Garcin reported to Khan that he had "just confirmed an appointment with the Economy Ministry on Thursday" and that he expected to "receive the nod in the meantime." Garcin explained the remaining steps: "minister issues the letter with conditions— we respond and agree/mark up—then they give greenlight and we move to close."

71.     On January 17, 2026, Garcin reported that he would meet with "key decision makers across various levels of the Executive Branch and the Political Class [that] week."

72.     On January 19, 2026, Garcin met with former French president François Hollande in his office and reported to Thiel that the meeting had been "successful."

73.     On that same day, Thiel acknowledged that "quite surprisingly" MARA had "received draft authorization from French government to proceed," noting that "the letter came 60 mins after Francois Garcin finished a meeting w[ith] former French president Hollande."

74.     On January 23, 2026, newspaper La Lettre published an article titled "Despite Trump, the French Treasury Directorate plows ahead with the sale of Exaion to the American [company] MARA," which Thiel forwarded to Garcin.

75.     In short, Plaintiffs fully performed their obligations under the Engagement. Among other things, Plaintiffs originated and advanced MARA's acquisition of Exaion; managed negotiations and relationships with Exaion's representatives, with EDF, and with representatives of the French government; provided advisory input on transaction terms; assisted with due diligence; and provided public-relations and communications advice concerning the transaction.

76.     Plaintiffs further introduced MARA officers to French government stakeholders at the highest levels. These introductions included French officers/advisors at the Elysée, Matignon, the Ministry of Economy, the French Treasury, the Economic Advisor to the Prime Minister, and the Head of the Office of Foreign Investment Control and were meant to help MARA navigate the politically sensitive foreign-investment-authorization process and to present the Exaion transaction as a sovereign act in France's national interest.

77.     Plaintiffs also helped establish MARA's French and European entities. After these entities were established, Plaintiffs also sourced and assembled the team that would staff MARA's European operations upon the formation of MARA France, including Gérard Mestrallet (the former Chairman and CEO of Engie), Steven Zunz (Forward Global), and Alexandre Hollander (founder and CEO of Amarante).

78.     MARA repeatedly and publicly credited Plaintiffs for this work.[10] In a press release dated August 25, 2025, attached hereto as **Exhibit B**, MARA announced its European expansion,

---

[10] Yet another example of MARA's satisfaction with Garcin's work is that, in or around August and September 2025, Thiel asked Garcin to formally manage MARA's Middle-Eastern operations, which Garcin did.

appointed Garcin General Manager of Europe, and stated that, since joining MARA, Garcin had "been responsible for spearheading the formation of MARA France and MARA Europe and played an instrumental role in securing the Company's recent investment agreement with Exaion."

79.     The Exaion acquisition was central to MARA's public transformation from a pure-play Bitcoin miner into a multinational, digital-infrastructure company. The Engagement's scope expressly encompassed the creation of data centers to execute "High Performance Computing," and MARA publicly touted the Exaion acquisition as its entry into artificial-intelligence, HPC infrastructure, and secure-cloud services.

### E.    MARA Reveals Its America-First Corporate Culture

80.     Even as MARA publicly committed to a transatlantic, pro-France, pro-European strategy, its corporate culture told a different story.[11] MARA's internal communications reveal an "America-first" atmosphere—one that stood in stark contrast with the transatlantic strategy Plaintiffs had been engaged to build. The MARA Executives actively worked to ensure that the center of gravity at MARA remained in the United States, where their power, influence, and compensation potential were concentrated. They did this for their personal benefit and against the interest of MARA and its shareholders. This is because, as MARA France and MARA Europe began to take shape and Garcin emerged as their public face, the MARA Executives perceived those entities and Garcin as a growing threat to their own standing within the Company. This America-first dynamic drove the MARA Executives to actively resist the European strategy and

---

[11] As part of this phony pro-France strategy, beginning in or about January 2025, Thiel also started soliciting Garcin's help to seek French citizenship, expressing concerns over the state of the United States. On information and belief, Thiel's duplicity was meant to manipulate European business leaders, including Garcin, into believing that he genuinely supported a transatlantic strategy and did not have an America-First agenda.

ultimately abandon it in favor of an America-centered strategy, all at the expense of MARA, its stock price, and its shareholders.

81.    On January 16, 2025, Thiel informed Garcin that he was "heading to Washington [] for inauguration events," referring to the inauguration of President Trump. MARA's alignment with the incoming administration's "America-first" policies was reflected in its corporate culture.

82.    On March 5, 2025, Thiel touted the fact that he was "stuck on a call w[ith] Trump administration" and was going to visit "the White House" to see "Trump and cabinet members re crypto policy."[12]

83.    On October 5, 2025, in a group WhatsApp chat including Thiel, Garcin, and Ford, Ford wrote: "Make Mara Great Again," demonstrating an "America-first" atmosphere among senior executives at the Company that Thiel did not object to or distance himself from, indicating this was the tone at the top of the Company.

84.    On January 17, 2026, Garcin warned Nowaid and Khan that the United States' America-first agenda was complicating his work on behalf of MARA. Specifically, that "Greenland-related tariffs could actually derail sine die the US-France relationship" and that "[t]he level of difficulty is kind of maximum."

85.    On January 18, 2026, Nowaid acknowledged this could jeopardize Garcin's efforts: "I agree our president is [not] helping us with Exaion right now," referring to President Trump's policies.

---

[12] Despite the America-First corporate culture at MARA, Thiel criticized the Trump administration in conversations with Garcin after this meeting, accusing it of having a Bitcoin agenda that prioritized the Trump family. In addition to these accusations of purported self-dealing, Thiel also expressed a low opinion of Eric Trump in derogatory terms, often using the term "dumb" when referring to him.

86.     Thiel also acknowledged this, explaining that MARA had received authorization from the French government "[i]n the midst of escalating US French tensions over Greenland" and underscoring the political headwinds that Plaintiffs had to navigate on MARA's behalf.[13]

F.     **MARA Executives Resist Implementing the Transatlantic Vision**

87.     While Plaintiffs were building MARA's European strategy, a faction of MARA's senior executives based in the United States, the MARA Executives, were working behind the scenes to tear it down. The Triumvirate understood that the success of MARA France and MARA Europe would inevitably shift decision-making authority, resources, and influence toward the European operations and away from the U.S.-based executives who had long dominated the Company. To prevent that shift, they conspired to interfere with the Engagement and systematically marginalized Garcin, second-guessed his strategic judgments, tried to sandbag his projects, and understated reports to Thiel about the progress of key initiatives, even though this went against the interest of MARA and its shareholders and against the exceptional results that Garcin continued to deliver and which MARA publicly celebrated.

88.     Garcin tried to handle the resistance he faced within the Company diplomatically by taking it to Thiel directly and asking for his help. For example, when Khan and Nowaid were undermining an opportunity with Rothschild,[14] Garcin asked Thiel to get involved. On July 23, 2025, Garcin wrote to Thiel: "Fred, I think [Khan] & [Nowaid] are both mistaken about Rothschild. I do not want to confront them. You may need to get involved. They do not understand the

---

[13] Consistent with his duplicitous tactics, Thiel sent a message from his personal number to Garcin and Ford just three days later, stating: "Trump's bluster and dunder on the Greenland issue was a tonight air and he is now bragging about how he has negotiated a deal re Greenland….TACO trade repeat."

[14] Rothschild was supposed to provide valuable, strategic advice to MARA France but, on information and belief, the Triumvirate managed to sabotage the relationship with Rothschild.

opportunity set or how the game is played i[n] Europe." Thiel led Garcin to believe it was being handled by responding: "I'll discuss w[ith] them today."

89.    Similarly, on August 5, 2025, Garcin sent a detailed message to Thiel and Ford warning that the Exaion deal was at risk due to internal resistance: "[Dickerson] & [Khan] are draping themselves in other considerations which are not actually about the Exaion opportunity" and that "deal team is focused on point scoring or retarding [maneuvers] which may disqualify us altogether." Garcin noted that despite having "brought the deal to the Mara table," having "a personal relationships with Exaion founders," and being "the advisor of record per contract with Mara," the deal team "treated me as an undesirable outsider for most of the play." Garcin warned: "We are about to steal defeat from the jaws of victory."

90.    On December 1, 2025, Garcin sent a written communication to Thiel reporting that "not all the people involved are moving with full alignment toward the European strategy you are leading" and that "the speed and manner in which certain information has been reported, amplified, and interpreted in an alarmist way clearly show" internal resistance. Garcin warned that "the distortion that today concerns my work, if not corrected, could tomorrow be applied to your strategic directions or your decisions."

91.    On January 25, 2026, Garcin spoke with Thiel about Dickerson's "negative" attitude towards Total, a deal within the scope of the Engagement Plaintiffs were pursuing on behalf of MARA in furtherance of the European strategy. Dickerson ultimately tried to sabotage that deal by leading Thiel to believe that Total wanted to cancel the deal. Garcin had to explain that this was not true and the reasons why Total wanted to finalize the deal. In reality, it was Duncan who "made a decision he doesn't want to deal with Total and is gaslighting it at every opportunity by framing everything based on his personal emotions and what he thinks he knows

from interacting with them in a prior life." Garcin was forced to arrange a call between Total Energie's leadership and Thiel to confirm that Total would not cancel the deal.

92.    Eventually, the resistance by the Triumvirate began to impact Thiel, who started showing a willingness to step back from MARA's transatlantic strategy. On February 7, 2026, Thiel sent a message to Dickerson and Nowaid stating: "Between the cost of advisors, the various members of the management team who are all asking for pieces of this business, and the complexities of doing deals in France, I think it may be time for us to pack up our tent and focus on other areas." Khan seized on this and encouraged Thiel to abandon the Exaion transaction altogether: "The best deals are the ones that we don't do. I wholeheartedly agree with your assessment."

93.    On February 13 and 14, 2026, Dickerson drove an even bigger wedge between MARA and Garcin's team in Europe when he objected to Garcin including members of MARA's European team on an email thread about a French digital-infrastructure company, writing: "Please do not add non-MARA employees to threads like this." Garcin made it clear he was insulted by Dickerson's comment: "this is not the first time that I am left flabbergasted by the innuendos and random pseudo fiduciary corporate governance lecturing."

94.    The next day, on February 15, 2026, Garcin drafted a communication to Ford seeking to invoke whistleblower protections under the Sarbanes-Oxley Act, stating that he had witnessed several highly disturbing fact patterns in the management of the Company's affairs by certain key professionals and that these individuals were behaving in an adversarial manner behind Thiel's back. Garcin reported that the conduct included intimidation, small vexations, and uncalled-for remarks as well as "s[y]stematic sandbagging of projects, making deliberately false statements about progress report on Key projects to Fred Thiel."

28

95.     On February 16, 2026, Garcin again appealed directly to Thiel for help: "I have been subject to a lot of negative thoughts lately and a lot of frankly offensive behavioral attacks thrown at me by various people in our organization and around our program and I opened up to Alison Ford yesterday that I was hoping we would have a bilateral reset/gentlemen's agreement for the go forward opportunities."

96.     On or about February 20, 2026, Garcin began receiving reports from Total executives that Dickerson was again attempting to derail the joint venture Plaintiffs were pursuing with them—this time, by intentionally inserting inconsistent numbers and data into spreadsheets, which made it difficult for Total executives to reconcile the numbers. On information and belief, this was not the first time that Dickerson had used this strategy to sabotage a deal that was not to his perceived advantage. Executives at Total and financial advisors involved in the Exaion deal on both sides of the Atlantic complained to Garcin that they had caught Dickerson manipulating numbers on multiple occasions. When Garcin complained to Thiel about this wrongdoing, Thiel refused to intervene.

97.     Despite Garcin's appeals to Thiel, help never came. As set forth below, by March 6, 2026, Thiel terminated, and caused MARA to terminate, the Engagement, refused to pay Plaintiffs for their services, and began to take other steps to abandon the transatlantic strategy.

## I.     **MARA Raises the Pretextual VAT Issue**

98.     For seven consecutive months, MARA paid Plaintiffs' invoices, which included VAT payments, without objection. On July 31, 2025, Plaintiffs issued its first monthly advisory invoice to MARA in the amount of €240,000, consisting of a €200,000 monthly advisory fee plus €40,000 in VAT at the applicable French rate of 20%. The invoice described the services as

"project management and support on Total Energies JV implementation & Exaion origination and closing assistance and other key strategic projects."

99.    From August through November 2025, Plaintiffs continued to issue monthly advisory invoices to MARA, each in the amount of €240,000 (€200,000 plus 20% VAT), for the same advisory services. MARA paid each of these invoices without raising any objection to the inclusion of VAT.

100.    The inclusion of VAT in the invoices should have come as no surprise to Defendants. On October 14, 2025, Garcin sent an email to MARA's finance team providing advance notice that "VAT interco movement [would] be added back on all professional fees owed under the [Engagement] at the prevailing blended rate applicable to the project," explaining that the Exaion and Total projects "[would] generate meaningful fees owed under the contractual arrangements." Garcin even specified that the Exaion fee would be "4% of €248.5m (overall financing contracted with Exaion/EDF to be executed in Dec) or €9.94m + VAT@20% = €11.928m." MARA did not object to this at the time.

101.    MARA's awareness of VAT extended all the way to its senior accountant, John Ellis. On October 7, 2025, Ellis wrote to Garcin confirming that Plaintiffs' September 2025 invoice, which included VAT at the applicable rate, "must be [. . . .] awaiting someone's approval" and that MARA would "investigate [. . .] and get it paid asap." Ellis confirmed that MARA would "send [Garcin] a wire." This communication confirmed that, as of October 2025, MARA's finance team was processing Plaintiffs' VAT-inclusive invoices through its standard approval process without raising any objection to the inclusion of VAT.

102.    VAT also was not unique to Plaintiffs and had come up with MARA's other European advisors, including on the same deal. On November 26, 2025, Stifel wrote to Dickerson

30

requesting "an amendment to the [i]nvestment agreement to reflect that the transaction fees indicated in the Permitted Leakage definition are excluding tax / VAT," explaining that VAT would be due. Dickerson responded: "You need to pay a 20% VAT on top of banking fees?" This exchange confirmed that MARA's own corporate-development team was aware, no later than November 2025, that European advisors on the Exaion transaction would charge VAT at the French rate.

103.    It was not until January, 2026, that MARA began using VAT as a pretext to end the Engagement. John Ellis, for instance, raised questions about the inclusion of VAT on Plaintiffs' invoices for the first time, stating that "[MARA's] other service providers in the EU didn't have VAT added on their invoices." This was in response to Garcin's email that "[MARA's other] advisors are mistaken as [the Advisor Entities'] activities [] on behalf of Mara forces [them] to act as an EU enterprise" and provided a link to recent French jurisprudence from the Conseil d'État. Ellis also asked: "[W]ith regard to the invoice to be sent upon closing, are you anticipating that the invoice will also include VAT? That would be a more substantial amount based on the 4% payment."

104.    On February 16, 2026, Garcin wrote to Ford: "As it turns out, Stife[l] [. . .] is going to raise a VATable invoice to the deal." Garcin noted that this information had been "heavily negotiated in back and forth between Corporate Development / [Dickerson], Legal, and Finance teams during the drafting of the [i]nvestment [a]greement with E[D]F" and "was shared with [Dickerson] in writing in mid November by Stifel." Garcin stated: "So it was available all along within Finance department to connect the dots."

105.    On February 20, 2026, the day the Exaion transaction closed, Plaintiffs submitted

an invoice requesting payment of $8,451,540, representing the 4% success fee on the aggregate capital transacted, plus 20% VAT.

106.    On February 22, 2026, Khan demanded that Plaintiffs provide proof that Plaintiff had paid VAT to French authorities.

107.    On February 26, 2026, after MARA disputed Plaintiffs' VAT charges, MARA approved payment of Stifel's advisory fee, which included VAT at the French rate of 20%. MARA thus paid VAT to Stifel—a foreign advisory firm with a French establishment, in the same configuration as Plaintiffs—while simultaneously refusing to pay VAT to Plaintiffs.

108.    On March 2, 2026, Garcin appealed to Thiel regarding the $8,451,540 invoice, noting that the VAT issue was "just a vexation effort by [Nowaid] and [Khan]." In response, Thiel committed MARA would pay, stating that he had instructed Khan to make the payment. But Khan and MARA never paid. Tellingly, MARA did not merely refuse to pay the VAT portion of the invoice; rather, MARA paid nothing at all, which underscores the pretextual nature of the VAT issue.

## J.    The Exaion Transaction Closes

109.    The Exaion investment was structured in tranches. The primary cash investment was approximately €115 million, and a secondary investment was approximately €33 million. The Investment Agreement further provides for a third tranche, contemplated for 2027, obligating MARA to invest an additional €110 million (the "Third Transaction").

110.    On February 20, 2026, the Exaion transaction closed and triggered MARA's obligation to pay Plaintiffs the 4% success fee. The closing was the culmination of more than a year of work by Plaintiffs: originating the transaction, managing negotiations with EDF and Exaion, navigating French regulatory approval at the highest levels of the French State, and

32

maintaining the political and commercial relationships that made the deal possible. Thiel himself declared it "a proud moment for MARA" and credited the "hard work and focus" of the team that delivered it.

111.    That same day, MARA issued a press release stating that "MARA France" had acquired "a 64% stake in Exaion" and that "[t]he objective of the partnership between MARA, EDF, and NJJ [was] to accelerate Exaion's expansion, strengthen its secure cloud and high-performance computing capabilities, and help establish Exaion—from France—as a leading European player in digital infrastructure." Thiel sent an internal message to MARA personnel stating: "This is a proud moment for MARA" and that the transaction would allow MARA to expand its presence in Europe "with greater speed."

112.    The closing triggered MARA's obligation to pay the Advisors the 4% success fee under Section 2(ii)(a) of the Engagement, which amounts to no less than approximately €5.92 million (4% of approximately €148 million). An additional €4.4 million (4% of approximately €110 million) will be due when MARA funds the Third Transaction in 2027.

### K.    Khan, Nowaid, and Thiel Get MARA to Terminate the Engagement with Dickerson's Help

113.    By early 2026, the importance of MARA's transatlantic strategy and the need to pivot away from relying solely on its Bitcoin-mining operations became apparent. In a February 17, 2026, internal announcement, Thiel stated that the Company was entering "a challenging phase," that Bitcoin was trading "at or near [their] cost to mine," that "the operating business [was] losing money on a cash basis," and that it was "war time" requiring "cost reductions across the organization." Accordingly, MARA implemented layoffs affecting dozens of employees. In March 2026, MARA sold more than 15,000 Bitcoin for approximately $1.1 billion to repurchase its debt.

114.    Knowing in advance of this announcement and that MARA was facing these challenges, and fearing that Plaintiffs' success might lead to the rise of MARA France and MARA Europe (with Garcin as the face of these European enterprises) as well as a shift of power, influence, and resources away from MARA's U.S.-based executives who had built their careers, reputation, compensation, and future around its domestic operations, the Triumvirate and eventually Thiel conspired to cause MARA to terminate the Engagement, get rid of Plaintiffs, and walk back the transatlantic strategy that Plaintiffs had been engaged to build, even though doing so went against the Company's interests. This included sabotaging the contemplated joint ventures with France's energy majors (Total, Engie, and RTE), the expansion of MARA France, and the contractually mandated funding of the Third Transaction.

115.    MARA could have paid Plaintiffs on March 2, 2026, when Thiel directed Khan to pay their invoice. However, when Khan continued to improperly withhold payment of the $8,451,540 invoice despite this directive, Thiel decided to close ranks and join Khan and Nowaid in continuing to withhold the invoice. Upon information and belief, Thiel has ultimate authority over whether to pay Plaintiffs and continues to intentionally cause MARA to withhold payment in breach of the Engagement.

**L.    MARA Terminates the Engagement and Breaches It by Refusing to Pay**

116.    Having extracted everything it needed from them, MARA decided it was time to discard Plaintiffs, without paying them what they were owed.

117.    On March 6, 2026, MARA terminated the Engagement without paying. The termination letter was signed by Nowaid. Upon information and belief Thiel approved the termination letter.

34

118.   MARA did not pay the Exaion €5.92 million success fee triggered by the closing; nor did it pay the €1 million remaining balance of the €2.4 million advisory flat fee.

119.   On July 7, 2026, Plaintiffs wrote to counsel for MARA, formally demanding payment of its outstanding fees and compliance with the indemnification and advancement provisions of the Engagement. MARA has not complied.

120.   As of the date of this Complaint, the following amounts remain due and owing, or contingently owing, to Plaintiffs under the Engagement, exclusive of interest and VAT: (a) the Exaion success fee of approximately €5.92 million; (b) the unpaid balance of the advisory flat fee amounting to €1.0 million, exclusive of interest and VAT; and (c) an additional success fee of approximately €4.4 million, contingent on the Third Transaction. Plaintiffs have also incurred, and continue to incur, legal fees and costs that are subject to MARA's advancement and indemnification obligations. These legal fees and costs currently exceed $600,000 USD.

121.   All conditions precedent, if any, to Plaintiffs' right to recover under the Engagement have been satisfied, performed, waived, or excused.

**COUNT I**
**Breach of Contract (Fees)**

122.   Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 121 as if fully set forth herein.

123.   The Engagement is a valid and binding contract between Plaintiffs and MARA, supported by consideration.

124.   Plaintiffs performed (or exceeded) all of their obligations under the Engagement, or such performance was waived or excused.

125.   MARA breached the Engagement by, among other things, failing and refusing to pay: (a) the Exaion success fee of 4% of MARA's investments in Exaion required by Section

35

2(ii)(a), triggered upon the closing of the Exaion transaction; (b) the unpaid installments of the €2.4 million advisory flat fee required by Section 2(iii)(a); and (c) refusing to pay the VAT due and owing on the foregoing.

126.    As a direct and proximate result of MARA's breaches, Plaintiffs have been damaged in an amount to be determined at trial, but no less than approximately €6.92 million currently due and owing, plus pre-judgment and post-judgment interest, exclusive of VAT and of the contingent Third-Transaction fee.

## COUNT II
### Breach of Contract (Advancement and Indemnification)

127.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 126 as if fully set forth herein.

128.    Under Section 6 of the Engagement and Attachment A thereto, MARA agreed to indemnify Plaintiffs and to advance and reimburse their reasonable legal fees and expenses, as incurred, "in connection with any matter in any way relating to or referred to in the Engagement or arising out of the matters contemplated by the Engagement [. . .] including, without limitation, in enforcing the Engagement."

129.    Plaintiffs' fees and costs incurred in connection with this action and pre-litigation negotiations fall squarely within MARA's advancement and indemnification obligations because this action is aimed at "enforcing the Engagement." To the extent written notice is a condition of those obligations, Plaintiffs have provided it, including expressly by their July 7 demand correspondence and by this Complaint.

130.    MARA has breached its advancement and indemnification obligations by failing and refusing to advance and reimburse Plaintiffs' legal fees and costs, which currently exceed $600,000 USD and continue to accrue.

131.    Plaintiffs are entitled to advancement and indemnification of their reasonable fees and costs in an amount to be determined, together with the fees and costs incurred in enforcing their right to advancement and indemnification.

## COUNT III
### Breach of the Implied Covenant of Good Faith and Fair Dealing

132.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 131 as if fully set forth herein.

133.    Implicit in the Engagement is a covenant of good faith and fair dealing, which obligated MARA not to do anything that would have the effect of destroying or injuring Plaintiffs' right to receive the fruits of the Engagement.

134.    MARA breached the implied covenant by, among other things mentioned above, manufacturing a pretextual VAT "dispute," a bad-faith position that Plaintiffs did not fully perform under the Engagement, and a baseless reservation of "for cause" grounds as devices to withhold fees Plaintiffs had earned; by inducing Plaintiffs to expend their professional credibility with French stakeholders in support of a strategy that MARA insiders were simultaneously working to undermine; and by exercising its purported discretion under the Engagement in bad faith and arbitrarily, including by terminating it without cause, so as to deprive Plaintiffs of the benefit of their bargain, including the contingent fees for the Third Transaction that the Engagement contemplated.

135.    As a direct and proximate result of MARA's breach of the implied covenant, the Plaintiffs have been damaged in an amount to be determined at trial, plus interest.

## COUNT IV
### Declaratory Judgment—The Third Transaction

136.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 135 as if fully set forth herein.

137.    An actual, justiciable controversy exists between Plaintiffs and MARA concerning whether the Third Transaction will, upon funding in 2027, trigger MARA's obligation to pay the Advisors a success fee equal to 4% of that cash investment under Section 2(ii)(a).

138.    Plaintiffs contend that the Third Transaction, upon funding, triggers the 4% success fee. On information and belief, MARA disputes that contention.

139.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiffs are entitled to a declaration that, upon MARA's funding of the Third Transaction, MARA is obligated to pay Plaintiffs a success fee equal to 4% of the cash investment, in an amount of approximately €4.4 million (plus any applicable VAT).

## COUNT V
### Quantum Meruit / Unjust Enrichment
### (Pleaded in the Alternative)

140.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 139 as if fully set forth herein.

141.    Plaintiffs performed valuable advisory, origination, and related services in good faith for MARA's benefit, including services that enabled MARA to acquire a controlling stake in Exaion and to establish its European business, with the expectation of being compensated for them.

142.    MARA accepted, used, and benefited from those services, including by publicly crediting the Plaintiffs' work, and MARA was aware that Plaintiffs expected to be compensated for them.

38

143.   It would be inequitable for MARA to retain the benefit of Plaintiffs' services without paying their reasonable value. Plaintiffs are entitled to recover the reasonable value of the services they rendered, in an amount to be determined at trial, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

(a) On Count I, awarding Plaintiffs compensatory damages against MARA in an amount to be determined at trial, but no less than approximately €6.92 million, plus interest;

(b) On Count II, ordering MARA to advance and indemnify Plaintiffs' reasonable legal fees and expenses, currently exceeding $600,000 and continuing, including fees and costs incurred in enforcing that obligation;

(c) On Count III, awarding Plaintiffs compensatory damages against MARA in an amount to be determined at trial, plus interest;

(d) On Count IV, declaring that, upon MARA's funding of the Third Transaction, MARA is obligated to pay Plaintiffs a success fee equal to 4% of the cash investment, in an amount of approximately €4.4 million (plus any applicable VAT);

(e) On Count V, in the alternative, awarding Plaintiffs the reasonable value of the services they rendered, in an amount to be determined at trial, plus interest;

(f) Awarding Plaintiffs pre-judgment and post-judgment interest, costs, and, to the extent permitted by contract or law, attorneys' fees; and

(g) Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated:      July 22, 2026                        Respectfully submitted,

*/s/ John T. Zach*
John T. Zach
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Email: jzach@bsfllp.com


Douglas M. Miller
Val Bianchi-Demicheli (*pro hac vice* application
forthcoming)
Boies Schiller Flexner LLP
2029 Century Park East, Suite 1520
Los Angeles, CA 90067
Email: dmiller@bsfllp.com
Email: vbianchi@bsfllp.com

Enoch H. Liang (*pro hac vice* application
forthcoming)
Boies Schiller Flexner LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94101
Email: eliang@bsfllp.com

*Attorneys for Plaintiffs*